All right, we will hear from the appellate's attorney, Mr. Rainsbury. Good morning, Your Honor, and may it please the Court, Joe Rainsbury, representing the appellant and the cross appellee, Messer, LLC. This is a UCC case involving a long-term requirements contract for the provision of industrial gases. It was originally signed nearly a quarter century ago in 1998. But this particular dispute concerns the 2008 addendum. And the focus of the dispute concerns the price escalation provisions in the contract. Now, the 1998 original contract had two provisions that addressed price escalations. The first provision, which was the standard... After that time, you continue to operate as though this first contract didn't operate. And ultimately, the other side decides, wait a minute, we've got this first contract from 1998, and we shouldn't be doing this and start objecting. And the question here that we now face is, was the original contract still in place at expiration of the five years? Is that it? Yes, sir. I think you've characterized the... You think it was? The issue very well. So... Convince us of that. I'm sorry? Convince us of that. Why that... Yes, sir. Why a contract under this particular law would still be in effect, even if it had a term of five years, an unapplicable contract law and interpretation of how... Well, we've got two arguments. And the first argument, I think, is a very straightforward one, which is just that under ordinary principles of contract amendment, when you amend a contract and you put in place a term that is inconsistent with the original contract, then you create a new contract. And that contract consists of all the terms that were unchanged plus the new terms. And one of the terms that's inconsistent, one of the original terms that's inconsistent with the 2008 addendum is this 2% price escalation cap. Clearly, the parties found that this wasn't working. And in 2008, they completely renegotiated the prices. They eliminated the 2% cap and they said, well, for a year, we're going to extend the contract for five years. For the second year, there's going to be a 9% price escalation cap. And for subsequent, the third, fourth, and fifth years, there's going to be a price escalation cap of 8%. And what the parties didn't do is they didn't address the contingency of, well, what happens if we agree to extend the contract? In other words, they didn't retract that 2% contract, the cap. Well, they did. Other than those that are specified in the addendum. They did not retract that, did they? Well, Your Honor, I would say that the provisions that they agreed to in the addendum were not consistent with the original 2% cap. I'm only, understand my question, which, don't anticipate that this is going to be a bad result going there. I just want to know if that point is true, that that did not, that amendment, whatever the addendum, did not retract the 2% from the first contract, other than what was specified in that addendum. Is that correct? Well, we would submit that as a matter of law, it did. Because under principles of amendment, you strike out anything that's not consistent with the amendment. But you're right, they didn't do it. Doesn't it have to be in writing? Don't you follow the statute of frauds? I mean, you change a contract, you can't. I mean, where are you going to get this from? Other than saying something outside is interpreted. Absolutely. Is there anything in there that eliminates the 2% cap that was originally there? Oh, well, first, the 2008 addendum very clearly was in writing, signed by both parties. So there's no question of that. And there's no requirement under the statute of frauds that every single provision be in the amended agreement. All it requires is that the amendment be signed. So there's not a statute of frauds problem with the 2008 amendment itself. The question that's posed is, you know, what is the legal, what did the parties intend in 2008? What did they intend as to the years beyond 2013? That is, you know, intent meaning, but when you're dealing with plain meaning of contracts, and under the law, when you do an amendment, it's pretty much understood, at least in this particular venue, that if it acts as a, an amendment acts as a substitute for the original contract, but only to the extent that it alters it. I think you agree with that. And you're saying this, in fact, does it. But the original contract may be abrogated in part with the rest of it remaining in fact. You do agree with that? I think that's a possibility. I think, again. I think I'm quoting that from some case or somewhere. Where did I get that from? I didn't make that up. That came from a black case. The problem here is the parties didn't address the circumstance that actually eventuated, which is that they agreed to extend the relationship. Well, I totally agree. You guys didn't sit down and talk about how this thing was going to work out. That's why you got this misunderstanding. The point you reach here, what you were doing then doesn't follow it. What we got to do is deal with the law, the law that is existing during that time. And the law. This is Pennsylvania law, right? The law, Your Honor, here is the UCC. And I think that's an important consideration. Because, as you know, the UCC. When you say UCC, you mean as adopted by the State of Pennsylvania, right? Of course. Yes. So Pennsylvania has adopted the UCC and incorporated it into its statutes. Yes. And as you know, the UCC takes a rather pragmatic approach toward contract interpretation. I mean, the common law is, well, you look within the four corners to determine. If there's no ambiguity, then you just look to the plain meaning. And to find the meaning, you open up Webster's and that's the end of it. Well, the UCC takes a more pragmatic approach that focuses pretty intently on how the parties applied the terms of the contract. I mean, basically the point is that to figure out what the parties meant, you look at what they did. And, I mean, this is stated very clearly in the official comments to UCC 2202. And I'll quote it. It says, the course of actual performance by the parties is considered the best indication of what they intended the writing to mean. Right. But you don't have any ambiguity that you've identified in the language, have you? I mean, you have at the bottom of Appendix 152 in the language of the addendum, Lindy will also be extending the current product supply agreement through September 1st, 2013. So there they referenced the umbrella product supply agreement, the agreement under which you're contending the 2% goes back in. And they're saying they're extending it through September 1st, 2013. That's an end date. So what is there to suggest that the product supply agreement that was extended through a firm end date in the addendum suddenly springs back to life? How do you get there? I'm sorry, what springs back to life, Your Honor? The 2% provision. Yeah, we don't think that it does. Okay. Well, then, how does the renewal provision spring back to life? Because the renewal provision, unlike the 2% provision, was not changed by the addendum. But wasn't it? By the language saying that the current product supply agreement is extended through September 1st, 2013. That's perfectly consistent with the automatic renewal provision operating as well. Well, the renewal provision, though, provides for an automatic, what, 10-year? Yeah, it's pegged to the initial term of the agreement. Unless it's terminated by notice. So it's 10 years or shorter, 12 months, if notice of intent to terminate is given. Well, that's different, isn't it? Well, I don't think so. Because, I mean, the parties can sit down and say, okay, we're not going to go by the automatic renewal provision, which would be 10 years. We're just going to extend it forward five years. But that doesn't mean that we're going to eliminate this requirement that notice be given 12 months before. That was still in effect. And as a practical matter, that's what happened. Nobody opted to terminate. And so the automatic renewal provision this time applied because they didn't have a specific term that they agreed to. And that's pegged to the original term of the contract, which was 10 years. And I want to get back to your point about ambiguity. I think both the district court and … Let's cabinet and make sure we're talking Pennsylvania law. Pennsylvania law says where the express language and the course of conduct of performance cannot be reconciled, then you look to the express language to prevail over the course of performance. And so the question that we keep getting back, at least I don't know if it's a springback or it's just there. I don't think it is springing from here, at least in terms of what's being alleged on the other side. It's simply saying that in order to move from the original, you must explicitly state you are doing it. And there is nothing that I see here that say the 2% cap was explicitly removed in the agenda. That seems to be the heart of the issue in this case when we're looking at how to figure out what express language. We can look at everything all day long, what you did, but then the contract says this. And it may look reasonable. It's indicating all that, but we're stuck with this under Pennsylvania law because this is express language. And so if you don't have that express language in there that removes that cap of 2%, then the course of conduct does not come in, the course of performance doesn't come into play. Are you following me on that? Well, I disagree that the express language of the contract says that even after the addendum, the 2% applies. That's not the question. No, it doesn't say that. What it does not say is even after the addendum, the 2% is gone. The question is, that's the express language we're looking for. Because it doesn't have to say you have 2%. The 1988 contract said it already. The question is to take it away, did you say it's no longer there? So that's the express language we're looking for. You can find that express language in the 2008 addendum, which says we're going to reset the prices, we're going to put in place a completely different cap. The problem here is that the parties didn't say anything. Why for five years? I'm sorry? Why do you put five years on it if it's doing that? Why does it have five years? Because that's in the 2008 addendum. Yes, that's the point. I'm asking, I'm asking, certainly the addendum did it for that term that's there. The question is, after the term ends, what does it do? I think our point is that, I mean, as a legal matter, the implication is that because it's inconsistent, it goes to the wayside. And we're just having a disagreement about what the parties intended would happen afterwards. That's not addressed by either end. Can I ask you a question? So I think the district court thought, look, the agreement is silent on what's supposed to happen after 2013. There's no express language saying that the original caps spring back. There's no express language saying they're gone for good. There's silence. And the district court thought, I can't actually, I don't want to try to describe the district court's reasoning. I understood that your, at least your second order argument would be, look, if there is a gap, if there's no express language either way, then under the UCC as adopted by Pennsylvania, that's precisely when we look to a course of conduct. Because I think that it says specifically, it can, like, fill a gap. A course of conduct can fill a contractual gap. So isn't, I thought that was sort of, your first argument is, look, it's clear under this kind of partial abrogation theory. It is actually clear that there's nothing to spring back. But I thought your kind of backup alternative argument is there's no express language either way. There is a gap. And then for seven years, everybody acts like the 2% caps are gone. And that's how we fill the gap. That's absolutely right. Because the parties never expressly stated in the 2008 addendum what would happen afterwards. And so we do have a gap. And under the UCC, parties' course of performance can be used both to clarify as well as to supplement the terms of the agreement. And I think the district court was under the misapprehension that you had to first somehow find ambiguity, that you couldn't just gap fill in this way. You had to find some sort of ambiguity. And that's just not the case under the UCC. And I point the court to the official code comments to 2202. And it says, pretty much in no uncertain terms, this section definitely rejects the requirement that a conditioned precedent to the admissibility of the type of evidence specified in paragraph A, which includes course of performance, is an original determination by the court that the language used is ambiguous. So there's no requirement that you find an ambiguity. And the code says when you have a gap, course of performance is the ideal thing to fill that gap. Because, again, the best way to figure out what the parties meant is to see what they actually did. And this case is even stronger than the cases that we cite in our brief. And there, there were like two instances of performance or three instances of performance. And the court said, OK, well, that's enough to establish a course of performance that's consistent with your theory. And in this case, we've got literally dozens of instances of performance. We've got notices of price increases that were more than 2%. In fact, for every year, for seven years, for every year, for every single gas, hydrogen, helium, nitrogen, and argon, the price increases were greater than 2%. And believe me, the current opposing party was not the party that was a signatory to either the original agreement or the addendum. They came in after the fact. But in 2013, Marcy Gagliac, which did sign the addendum, they were still there. And believe me, if it was their understanding that the 2% cap would come back into effect, the first thing that they would say when they got that notice is, wait a second, we didn't agree to that. You know, we agreed that the 2% cap would come back into effect. And they didn't say that. And they didn't say that time and time again. I mean, dozens of times there were price increases greater than 2% and they said nothing. And, you know, so it is the dog that didn't bark. It is their silence that is most telling about what the parties intended in 2008. So what is the impact of SBA on this, that case there? You know, where you're going, the question is, does Pennsylvania law preclude that type of a holding? SBA was not a UCC case. I understand that. But the principles, nonetheless, in terms of silence are there. Well, the holding of U- Because you're talking about a contract type. Well, the principle holding of SBA was, and I see my time is out. I don't want to run too much into my rebuttal time. But the main point of SBA was that silence alone can't create an ambiguity. And, you know, and then therefore you can't have a course of performance. But under the UCC, you don't need ambiguity to establish course of performance. You can use silence. I mean, you can fill a gap with course of performance. And that's how the UCC differs from ordinary Pennsylvania law. UCC is adopted by Pennsylvania. In Pennsylvania law, you don't need ambiguity. In other words, you can have an express contract that says something and still use course of performance. You can't use it to contradict the contract. But the point being is that the plain language can tell you something on a contract, but course of performance under this circumstance can prevail. Well, I- Because you said we didn't need ambiguity. Well, there's two things. I mean, SBA said silence can't create an ambiguity. And we're not saying that, you know, the course of performance has somehow altered the plain language of the agreement. We're saying there was a gap. And the course of performance filled that gap and explained what the parties intended when they- That might be, and I'll let you address it when you come back. But the question then, at least from my perspective, is how do you create a gap if the 2% was never removed? What is the gap? So ponder that on your return. I'll address that when I stand up again. Thank you. Why don't we hear from the other side? You have some moments for rebuttal, so we'll come back to you later, Mr. Rainsberger. So we'll hear now from Mr. Johnson. Yes. Good morning. May it please the Court, my name is Harold E. Johnson. I represent Bristol Metals, LLC, the appellee and cross-appellant in the case. Judge Winn, I think you got it exactly right with your focus on the plain meaning of the written contracts. That is the touchstone for contract interpretation, not only in Pennsylvania, but generally around the country. And in this particular case, we have not one, but two written instruments, each of which include price caps. And those price caps were specifically bargained for. When you look at the original product agreement, the price cap was added by a typewritten codicil to the form agreement that was supplied by the seller at the time. So clearly, the price caps are an important part of the agreement from the purchaser's perspective, given that they're entering into a long-term exclusive supply agreement. They need to have some form of price control. Well, the result that Messer argues for is that even though you've got two written instruments that explicitly require price caps and indicate the party's intent to have price caps in place, that somehow you can discern an intent to completely abandon price caps when the addendum expires in 2013. That makes no sense. What's the difference between a gap and silence? Well, Your Honor, I think the district court got this exactly right in relying on SBA towers when it noted that silence cannot create grounds for a party to use coarser performance or to find an ambiguity in a contract. And the SBA court noted, and the district court, Judge Novak, after summarizing the SBA decision, said silence does not do that much work. A party cannot use silence to come in and argue for a position that the party simply didn't address in the contract. Parties might agree to omit certain terms from a contract for all kinds of reasons. You can't presume from that silence that the court should be called upon to fill, whether you call it silence or a gap. So the Pennsylvania statute on this says that you can look at course of conduct to give particular meaning to specific terms of the agreement, but also to supplement the terms of the agreement. That just sounds to me like what they're saying is if the terms of the agreement don't actually address something and there's a gap or silence, whatever you want to call it, you can look to coarser performance to supplement. Doesn't that mean to sort of fill a gap? Well, I would respond in two ways. First of all, coarser performance in terms of the UCC can only be used to do that if it can be read consistently with the expressed terms of the contract. And so where is the expressed term that says after 2013 we're going back to the 2% price caps? I agree that if the addendum said that, that for these five years we're going to the 8%, 9% price caps and then we're going back to 2%, there would be no coarser performance argument here. There might be a waiver argument, but there wouldn't be a coarser performance argument. But I don't see the expressed terms that foreclose that reading. It's not expressed in the 2008 addendum, nor is the corollary expressed. Right, that's the gap. But, Your Honor, I think the fundamental point is that you have to look to the party's intent. And under the UCC... If it doesn't say one way or the other expressly what happens after 2013 and I need to figure out the intent, isn't that exactly what I'm supposed to look at the coarser performance? No, ma'am, because the expressed language that the parties use in both agreements includes a price cap. Now, isn't it at the very least the 8% price cap in the 2013 addendum would have to carry forward? But I want to make another point about the addendum, Your Honor. Parties can modify a contract temporarily. And that's what this addendum did. Unless the word... But, counsel, Mr. Johnson, what about the fact that the addendum provides a hard end date? That's the problem that I'm having with the argument that I'm hearing. The contract says the current, excuse me, the addendum at 152 says the current product supply agreement will be extended through September 1, 2013. Yes, ma'am. And so what about that is unclear? It's extended through September 2013. Isn't the only reasonable reading that it won't be in effect afterward unless something else is done? I agree completely. And that was my point. This addendum was temporary. It had a finite lifespan. And so to the extent it altered the terms of the original product agreement, it only did so for that five-year period, a discrete period. And the question becomes are the parties operating at will? If you agree with what Tina just said, if I'm understanding correctly, she's saying the contract ended on 9-13, the 9-1-13, and that that would seem to indicate that what happens from that date is an at-will type contract didn't exist. So then how... I'm trying to understand how that's going to fit in your argument. Well, we made that argument. Messer can't have it both ways where they get to say you're bound to a long-term, exclusive 10-year renewal under the original product agreement, but we get to jettison the price controls that you have in that agreement. Can I ask you a question about this? I feel like this is my role for the day. So the district court held this agreement is up for termination in 2023, and you didn't cross-appeal that, did you? Your cross-appeal seems to be limited to the damages question. We cross-appealed on the damages question because the issue... So we're stuck. We have to assume, since no one appealed it, this agreement ends in 2023, or at least it's up for termination in 2023. Well, Your Honor, we did not appeal that issue because we were the prevailing party. I understand you cross-appealed. But I do think if... I don't believe this court is stuck. I think if the court were inclined to accept Messer's argument that after 2013 there is no price cap in place, it would also be appropriate to remand for the district court to consider what that means for the renewal period. Because as Judge Keenan has noted, this five-year extension under the addendum is absolutely contrary to the renewal provision in the product agreement. And so if the price caps that are different in the second agreement mean that you no longer have the price caps in the first agreement, then the term provision in the second agreement means you no longer have this renewal and term provision in the first agreement as well. So I think... Without reaching the question ourselves, you think if we... I just want to make sure it's hard for me to keep the argument straight, but that if we thought the 2 percent caps had been abrogated, we should remand and let the district court figure out how that affects the rest of the case. It's a question that we presented to the district court in a position we took. We asked for declaratory relief as an alternative. I know you raised it in the district court. Yes. And so I do think that's an issue that can be addressed by the district court on remand as to what the impact would be in that situation should the court find that way. Thank you. The other... Judge Harris, you raised a question earlier about the gap and doesn't the UCC allow for course of performance to supplement the terms of the contract. Generally, that provision is in the UCC. However, if you look at the specific provisions governing the sale of goods and specifically Section 2209 of Title 13 of the Pennsylvania Code, that's where you get a separate set of rules for contracts for the sale of goods that require a modification to be in writing. And so in addition to 1303, which says that the express terms will prevail over course of performance where they're irreconcilable, which I would submit we have here, Section 2209 requires for contracts for the sale of goods worth more than $500, you have to comply with the statute of frauds in order to have any sort of modification of the terms of the contract. But I thought that was a whole separate argument that was made below. The district court rejected it. It's not on appeal that quite apart from the contract, forget the contract, just anything the contract says now is changed by the course of performance. And the district court said, nope, nope, you haven't complied with the statute of frauds and no one is appealing that. So that's not really, there's not a statute of frauds problem here because everything is in writing and we're just trying to figure out what the writing means. There is no writing that says we will not have price caps moving forward. And that would be a modification of both the 1998 product agreement and the 2008 addendum to hold that Messer can just charge whatever prices they wish until the ultimate expiration in 2023. That would be a modification of the party's written agreement. Can I just ask you, sorry, on a slightly different question about the course of performance. So I know the UCC says that you pay sort of special attention to a course of performance that's contrary to someone's economic interests, right? Like obviously, the theory would be obviously if you thought the 2% caps controlled, you would have said something because it would have been so advantageous for you to hold them to those caps. Do you have an account for why that didn't happen? We don't. There's no evidence in the record of that. And that has to do, we're several parties removed from the original contracting parties. But I think, Your Honor, the evidence that is in the record suggests the following. When Bristol Metals assumed this contract in 2017, they immediately tried to terminate it. And they were told by Messer, oh, no, the 1998 product agreement is still in place and it was renewed in 2013. In December of 2013, not when this addendum expired in September, but later on that year when a new hydrogen tank was replaced at the facility. Messer said that triggered the renewal provision in the product agreement. So Bristol Metals thinking, okay, we're stuck with this for another six years, they went along with it and I think what caused them to take a deeper look, Your Honor, is that between 2017 and 2020, the pricing for helium spiked under this contract, the charges they were getting from Messer, by 60%. It went from, I think it's around $0.31 and $0.48 per unit to $0.49 and $0.50 per unit. So practically speaking, I think that's when Bristol Metals took a look at this and said, this is crazy. We're stuck to this long-term agreement with no price protection. How can that be? And that led to their ultimate decision to pursue this matter. But certainly there are all sorts of reasons why parties may waive rights and pay an elevated invoice over time, whether it's economic efficiency to keep their supply chain intact, to avoid litigation costs. I would note that the municipal authority of Westmoreland County case that was relied upon by the court and is cited throughout both sets of briefs, that involved a waiver of over nine years where the party did not exercise its contractual rights for nine years. And then when it came back under new ownership, similar to what we have here, and said, no, we want to tack in, it had to do with refunds or post-production costs rather for gasoline production. And so it changed the pricing. When they said they wanted to exercise that right, the court in municipal authority of Westmoreland County noted, well, you may have waived it retroactively. That does not work, and that course of performance does not work as a modification of the contract moving forward. So again, that's where I think even with a gap, Your Honor, Section 2209 requires that there be some writing to fill that gap. Otherwise, you revert back to the party's expressed intent in the words that they used in the written agreements. So you've got the 2% price cap under the product agreement, a finite five-year extension with an 8% cap under the 2008 addendum. One of those has to apply. If I may, Your Honor, I'll move on to our cross appeal as to damages. And here we think the district court erred because it held that Bristol Metals waived the right to bring a cause of action for inflated invoicing based on the 2% price cap because it did not, even though it did not pay any invoices at the inflated prices from the start of 2020 forward. And so we would submit that Bristol Metals is entitled to damages from the time it revoked its waiver on January 24, 2020. There's several reasons for this. First, the court's ruling runs afoul of the applicable law governing installment contracts. Under an installment contract in Pennsylvania and elsewhere, every delivery or invoice is a separate transaction that gives rise to a separate cause of action. It follows that BrisMet's waiver applied on an invoice-by-invoice basis, not on an annualized or prospective basis. That's consistent with the product agreement itself, which has payment terms of net 10 days and specifically gives Bristol Metals the ability to challenge an invoice or delivery within 10 days after receipt. Secondly, the court's ruling conflates the issues of waiver and modification. And this again goes back to the municipal authority case that I just cited. The court effectively found that Bristol Metals waived its right to contest all invoices for 2020 before it had even paid any of them and after it received the first ones. Actually, before it received those. That actually is not a waiver, Your Honors, but a modification of the contract. It is saying we are going to change the pricing term prospectively for at least one year and beyond because the price increases are cumulative. That's a modification, not a waiver, and the municipal authority case makes that clear. It refers to a waiver as prospective and permanent, or excuse me, a modification as prospective and permanent, whereas a waiver can be temporary and is generally retroactive or retrospective. A waiver, as the court and municipal authority noted, is most often used as an affirmative defense to a breach of contract cause of action. So would you characterize the 1998 agreement as an installment contract and how that would affect in terms of how often the 2% cap recurs in the invoices that it receives? Yes, sir. It is an installment contract as defined under the UCC because it calls for separate deliveries over time and different deliveries and invoices. I think it is interesting in its opening briefs in the court below, Messer acknowledged that until Bristol Metals receives an invoice, it doesn't even have a cause of action for breach of contract. This is in the judicial appendix at pages 104 and 105, and we quoted it in our briefs in this court, where Messer understood that in an installment contract context, it's the receipt and payment of the invoice that gives rise to a claim for damages. Messer's announcement that it's going to raise its prices may be a statement that it intends to breach its contract, but until Bristol Metals makes a payment under protest, it doesn't have the damages to sustain a breach of contract action. Messer made that argument in contesting our right to bring a declaratory judgment action. I feel like maybe there's something I'm not understanding, and you can clarify it for me. Assuming the 2% price caps are in effect, the breach happens when the costs go up by more than 2%, when the prices are, in fact, escalated beyond 2%. If that happened before the waiver was retracted, even if your cause of action for that breach doesn't accrue until you pay and now have damages, those seem like two different things to me. The time of the breach, which would be when the costs go up by more than 2%, and the time you pay it and accrue your cause of action. But are those actually the same thing? Is that what you're saying? Well, I think it goes back to the point that waiver is an affirmative defense to a cause of action for breach of contract. We could only waive our right to bring a cause of action for the inflated charges on any given invoice. Had we received this notification, and I see my time is up, if I may attempt to answer Judge Harris's question. Had we received this notification and then run to the courthouse to file a lawsuit, we wouldn't have had a claim yet. But you didn't have to. I think what the district court thought was, perhaps, that you didn't have to run to the courthouse. You had to object. That is what the district court thought. But that conflates what I've called the market check mechanism in the contract, where we could get a competing bid within 15 days with the price cap, which operates independently. And so I think any invoice that has improper pricing beyond the 2% price cap is actionable once we pay it. All right, Mr. Johnson, you reserved some time for rebuttal, it looks like to me. Is that correct? Yes, sir. All right, we'll hear back from you. Let's hear from Mr. Rainsbower. Okay, if I can start briefly by responding to the damages point. I think what the court needs to focus on is, well, what is the alleged breach here? The alleged breach is increasing the price more than 2%. When did that occur? Well, it last occurred on January 1st of 2020. But the district court said that Brisbane has waived any objection to price increases that occurred before they retracted their waiver, which was January 24th, 24 days later. And so they don't have a claim at all. I mean, their suggestion is that every time the goods are invoiced, that means that there's been a price increase. And that doesn't follow. That doesn't make any sense. The price increase was on January 1st, and that was before the retraction of waiver. And I want to respond briefly to their argument that somehow they were stuck in this contract and that Messer could raise the price whatever it wanted, you know, helium 50%, 80%, 90%, whatever. Well, the reality is the contract has another protective mechanism. And rather than have a specific percentage cap, it has sort of a I cut, you choose arrangement. It says that we'll propose a price increase, and you've got 15 days. And you can either come forward with a better deal, or you can accept that price increase. So if they could have come forward with a better deal for helium, then they had every opportunity to, and that would have gotten them out of the requirements contract. They never found a better deal. And so they never took advantage of that provision. And finally, I just want to go back to the 2008 addendum. I think there's probably a reasonable disagreement about, you know, what the silence means, whether the silence means that there's no price escalation cap after 2013, whether it means that you go back to the original 2%, or maybe that you just, you know, you keep on with the 8% that was in place in 2013. But the problem is nothing in the 2008 addendum addresses that. And so the parties were silent on that. And that is exactly the type of circumstance that under the UCC, you look to how the parties actually, in practice, apply that agreement. And course of performance is particularly important, where the party who's now claiming a different interpretation of the contract actually performed it in a way that's in accordance with a less favorable provision. It's like an admission against interest. Thank you, Mr. Ringsberg. Thank you, Your Honor. Mr. Johnson, you have just a brief bubble. Yes, Your Honor, thank you. And I'll return to Judge Harris' line of questioning when I was last before you. The distinction between a breach of the price cap by notifying Crystal Metals that Nestor was going to increase its prices and the invoice-by-invoice breach that I've advocated for is, again, where the line between waiver and modification gets blurred. And that's what the municipal authority case, I think, stands for. Waiver can only apply when you have a cause of action, when your rights have been adversely impacted by the breach. And so a statement that, hey, we're going to raise our prices in breach of the contract does not give rise to a cause of action until that damage actually occurs and the cause of action accrues. That's when the statute of limitations begins to run. And so I think that's the distinction there. With regards to Mr. Rainbury's final point as to silence creating ambiguity, I think that's in direct contravention of the SBA case. And I would also note that SBA was not a contract for the sale of goods, but it was a commercial lease, so it is technically governed by the UCC. Your Honors, if you have any further questions, I'd be happy to address them. Thank you very much. Thank both of you. As you heard me say previously, we have suspended the practice of coming down to shake your hands. We do continue to recognize that is a tradition and we will be able to reinstate it. But for now, as I indicated, we believe the risk exceeds the benefits, and we don't want to give you anything to take back home to your loved ones and those that you're with, and we don't want you to give us anything. So we think this position is quite well where it is. But we're glad to have you here, and thank you for your wonderful arguments.
judges: James Andrew Wynn, Pamela A. Harris, Barbara Milano Keenan